

In The

# Court of Appeals
## Seventh District of Texas at Amarillo

_____

No. 07-20-00360-CV
_____

IN THE INTEREST OF C.W., A CHILD

On Appeal from the County Court at Law No. 1
Randall County, Texas
Trial Court No. 76,548-L1, Honorable Jack M. Graham, Associate Judge Presiding

April 29, 2021

## MEMORANDUM OPINION

Before PIRTLE and PARKER and DOSS, JJ.

In this accelerated appeal, appellant, B.D., seeks reversal of the trial court's judgment terminating her parental rights to her son, C.W.[1]  In three issues, B.D. challenges the sufficiency of the evidence to support the trial court's predicate findings of endangering conditions and endangerment, and failure to comply with the provisions of the court-ordered family plan of service, in addition to the trial court's finding that

---

[1] To protect the privacy of the parties involved, we refer to them by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2020); TEX. R. APP. P. 9.8(b).

termination is in the best interest of C.W. Finding no error, we affirm the judgment of the trial court.

## Background

B.D. is the mother of thirteen-year-old C.W. The father of C.W. is deceased.

In August of 2019, the Texas Department of Family and Protective Services received a report alleging that B.D. used drugs and was neglectful in her supervision of C.W. A department investigator was called to B.D.'s residence by law enforcement officers who were conducting a welfare check on C.W. After discovering methamphetamine and drug paraphernalia at the residence, B.D. and her boyfriend, D.B., were arrested. The Department took custody of C.W. because there was no one else available to care for him. At the time of her arrest, B.D. admitted to the department investigator that she used marijuana within the last week and used methamphetamine in December of 2018.

As a part of the investigation, the Department requested that B.D. submit to a hair follicle drug test. It was positive for methamphetamine. The department investigator also interviewed C.W. According to C.W., there is marijuana in the home and his mother smokes it when he is not around. He also stated that his mother used to smoke methamphetamine but "she went to rehab in 2016."

The Department filed its petition for protection, conservatorship, and termination of parental rights of B.D. as to C.W. Following an adversary hearing, the Department was appointed temporary managing conservator and C.W. was placed in an emergency

2

shelter.  On November 1, C.W. was placed in a therapeutic foster home in Marshall, Texas.

The Department developed a family service plan for B.D., and, because she was continuing her relationship with D.B., the Department listed D.B. as a participant in the plan.  The service plan set out several tasks and services for B.D. to complete before reunification with C.W. could occur.  These tasks and services included the following: complete a psychological evaluation and follow recommendations; maintain regular contact with her caseworker; abstain from the use of illegal drugs; submit to random drug screens; locate and maintain stable housing that is free from drugs and violence; locate and maintain stable employment; complete a psychosocial assessment and follow recommendations; attend individual counseling; take parenting classes; participate in rational behavior therapy (RBT); participate in a substance abuse assessment at Outreach, Screening, Assessment, and Referral (OSAR) and follow recommendations; and attend visitation with C.W.  The purpose of the family service plan was to work with B.D. to mitigate the reasons for the removal of C.W.

B.D. satisfied the plan's requirement that she maintain stable housing, complete a psychosocial evaluation, attend counseling, participate in RBT, and attend parenting classes.  B.D. was employed for a short time after she was released from jail in January of 2020.  B.D. submitted to some but not all of the drug screens requested by the Department.  After testing positive for amphetamine and methamphetamine in April of 2020, B.D. attended Narcotics Anonymous (NA) as recommended by OSAR.

3

B.D. was indicted for child endangerment and possession of a controlled substance resulting in her incarceration from December of 2019 until the end of January of 2020. After B.D. was released from jail, she and D.B. relocated to Post, Texas, to live with D.B.'s mother.

B.D.'s last in-person visit with C.W. was in February of 2020. According to the department caseworker, C.W. is bonded to B.D. and the visit went well. Due to the COVID-19 pandemic, restrictions on in-person visitation were instituted from March until July. B.D. did not exercise any in-person visitations with C.W. after the restrictions were lifted in July of 2020. B.D. is permitted to have weekly telephone contact with C.W. but she has been inconsistent with that contact, resulting in distress and disappointment to C.W. C.W. has reacted with angry outbursts due to B.D.'s missed telephone calls and his grades have been negatively affected.

The Department presented evidence that B.D. and D.B. pled guilty to the felony offenses of child endangerment and possession of a controlled substance on January 27, 2020, and received four years' deferred adjudication community supervision. While on supervision, B.D. tested positive for amphetamine and methamphetamine in April and May. B.D. failed to submit to a court-ordered drug screen in July and she tested positive for methamphetamine in August. D.B. also tested positive on those same dates, and he tested positive for methamphetamine in September.

B.D. testified that she has used methamphetamine "off and on" since the "early 2000's." She had periods of sobriety for two to three years, then she began to use again on the weekends. B.D. testified that her last "intentional" use of methamphetamine was

4

in June or July of 2019. B.D. did not submit to a drug screen on September 23, 2019. Her urinalysis on October 21 and November 20 was negative. In 2020, B.D. tested negative for illegal substances on January 30, February 15, and March 20. B.D. tested positive for amphetamine and methamphetamine on April 28. She attributed the positive test result to using an old vape pen that contained methamphetamine residue. On May 18, B.D.'s hair follicle drug test was once again positive for amphetamine and methamphetamine. B.D. attributed that positive result to the use of the vape pen in April. On June 23, B.D.'s drug screen was negative. B.D. was court-ordered to submit to a drug screen on July 27, but said she had "no transportation, no gas to get to Lubbock" for the drug screen. B.D.'s urinalysis on August 31 was negative, but her hair follicle test was positive for methamphetamine. She attributed the positive hair follicle drug test to "taking Sudafed, nose spray, home medicine" for her severe allergies. B.D.'s drug screens were negative in September and October.

At the time of the final hearing on November 3, 2020, B.D. and D.B. were living with his mother in Post. D.B. works for an RV park and provides financially for B.D. B.D. testified that she was employed "after I got out of jail and then COVID hit. With COVID-19 and me being a felon, it's hard to find a job." B.D. is a full-time student taking online classes at Strayer University to obtain a bachelor's degree in business administration. B.D. relies on loans, grants, and D.B.'s work income as her financial support. B.D. and D.B. have been attending NA for the past four months. B.D. requested that she be appointed as a possessory conservator and that C.W. remain in his current placement "for now." B.D. also testified, "A friend of mine down here says that she would take [C.W.] if the [D]epartment approves of her."

5

C.W. was placed with a foster family in Marshall, Texas, after his removal. C.W. is doing "quite well" in this placement. C.W.'s grades have improved, he is playing sports, and his behavior is calmer and more controlled. When C.W. came into the Department's care, he was aggressive. C.W. was previously diagnosed with attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder, and obsessive-compulsive disorder. C.W. is prescribed medication for ADHD. C.W. is happy in his current placement and the structure it provides. The placement is interested in providing a long-term placement for C.W.

The trial court terminated B.D.'s parental rights on the grounds of endangering conditions, endangerment, and failure to comply with a court order that established actions necessary to retain custody of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), and (O) (West Supp. 2020).[2] The trial court also found that termination was in the best interest of C.W. *See* § 161.001(b)(2). The trial court appointed the Department as the managing conservator of C.W.

Applicable Law

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the

---

[2] Further references to provisions of the Texas Family Code will be by reference to "section __" or "§ __."

parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1993)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id.*

In a case to terminate parental rights under section 161.001 of the Family Code, the petitioner must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2019); *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002). Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.,* 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894-95.

7

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). Even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, as long as those determinations are not themselves unreasonable. *Id.*

Standard of Review

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We

8

disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *In re K.M.L.,* 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient and we must reverse. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Analysis

Sufficiency of the Evidence Under Section 161.001(b)(1)(D) and (E)

In her first issue, B.D. challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights under section 161.001(b)(1)(D) and (E). Ordinarily, only one statutory predicate ground is required to support termination when

there is also a finding that termination is in the child's best interest. *In re A.V.,* 113 S.W.3d at 362. However, in light of the Texas Supreme Court opinion in *In re N.G.,* we review the trial court's findings under both subsections (D) and (E), when raised on appeal because of the potential future consequences to B.D.'s parental rights in a future proceeding concerning a different child. *In re N.G.,* 577 S.W.3d 230, 235-37 (Tex. 2019) (per curiam).

A trial court may order termination of a parent-child relationship if the court finds by clear and convincing evidence that a parent has knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child and/or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* § 161.001(b)(1)(D), (E). Both subsections (D) and (E) require proof of endangerment. To "endanger" means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Boyd,* 727 S.W.2d at 533. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.,* 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *In re N.K.,* 399 S.W.3d 322, 330-31 (Tex. App.—Amarillo 2013, no pet.).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the child. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.,* 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied). Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle*, 16 S.W.3d at 394.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions, but also by the parent's omission or failure to act. *In re M.J.M.L.,* 31 S.W.3d 347, 350-51 (Tex. App.—San Antonio 2000, pet. denied); *Doyle*, 16 S.W.3d at 395. To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 84 (Tex.

11

App.—Dallas 1995, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.). "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In the Interest of J.O.A.,* 283 S.W.3d 336, 345 (Tex. 2009). Because the evidence pertaining to subsections 161.001(b)(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.R.J.M.*, 280 S.W.3d at 503.

Here, the Department presented evidence that B.D. used methamphetamine off and on for more than fifteen years—both before and after C.W.'s birth. B.D.'s use of methamphetamine and marijuana was such that thirteen-year-old C.W. was familiar with her use of the substances, and C.W. was present when B.D. and D.B. were arrested. B.D. was in possession of methamphetamine and drug paraphernalia, and she was positive for methamphetamine when C.W. was removed from her care. B.D. pled guilty to possession of a controlled substance and child endangerment, and she was given community supervision probation. Within three months of being placed on community supervision, B.D. again tested positive for amphetamine and methamphetamine. The evidence established that B.D.'s drug use was not an isolated event but part of a course of conduct involving the use of illegal drugs. Moreover, B.D. failed to appear for a court-ordered drug test in July knowing that a missed test would be regarded as a positive test result. It was also established that B.D. maintained her relationship with D.B. despite

12

D.B.'s pleading guilty to child endangerment of C.W. and his multiple positive drug screens for methamphetamine during the pendency of the case. According to the caseworker, B.D. failed to abide by the service plan provisions for drug testing, abstinence from illegal drug use, and visitation with C.W. The caseworker also testified that B.D.'s pattern of methamphetamine use affected B.D.'s ability to provide for C.W.'s emotional and physical needs now and in the future. Evidence of illegal drug use supports a conclusion that a child's surroundings endanger his physical or emotional well-being. *See In re G.A.,* No. 01-11-00565-CV, 2012 Tex. App. LEXIS 2472, at *16 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.). A parent's ongoing drug abuse is conduct that subjects a child to a life of uncertainty and instability, which endangers the physical and emotional well-being of the child. *See In re A.B.,* 125 S.W.3d 769, 777 (Tex. App.—Texarkana 2003, pet. denied). "A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child." *In re E.M.,* 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied) (citing *In re F.A.R.,* No. 11-04-00014-CV, 2005 Tex. App. LEXIS 234, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.)).

Having examined the entire record, we find that the trial court could reasonably form a firm belief or conviction that B.D. knowingly placed or knowingly allowed C.W. to remain in conditions or surroundings which endangered his physical or emotional well-being and engaged in conduct which endangered C.W.'s emotional and physical well-being. The same evidence is factually sufficient to support the trial court's affirmative finding. We overrule issue one.

13

In light of our conclusion regarding the trial court's findings on subsections (D) and (E), we need not address the findings under subsection (O). *In re A.V.,* 113 S.W.3d at 362.

Best Interest of the Child

In her third issue, B.D. challenges the legal and factual sufficiency of the evidence supporting the best interest finding made under section 161.001(b)(2). A determination of best interest necessitates a focus on the child, not the parent. *See In re B.C.S.,* 479 S.W.3d at 927. Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.,* 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006).

In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were

undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re E.C.R.*, 402 S.W.3d at 249. The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *In re N.R.T.,* 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). We must also bear in mind that a child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in determining best interest. *See In re K.C.,* 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

The record indicates that B.D. used methamphetamine off and on for more than fifteen years and she admitted to recent use of methamphetamine and marijuana prior to C.W.'s removal. B.D. pled guilty to endangering a child, and C.W. was the victim. After receiving four years' deferred adjudication community supervision in January of 2020 for child endangerment and possession of a controlled substance, B.D. tested positive for amphetamine and methamphetamine in April and May. In August, two months before the final hearing, she again tested positive for methamphetamine. Although the evidence showed that B.D. completed most of the service plan's requirements, the evidence showed that B.D. did not comply with the portion of her plan designed to address the reasons that C.W. was taken into care, including B.D.'s failure to maintain a drug-free lifestyle and to provide a safe and stable home environment for C.W. B.D. continued to use drugs in the face of a court order conditioning her reunification with C.W. on her ability

15

to remain drug-free.  Despite D.B.'s multiple positive drug screens, B.D. remains in a relationship with D.B. and she is financially dependent upon D.B. for support.  Moreover, B.D. has taken very little initiative in providing for C.W.'s emotional needs.  B.D. has disappointed C.W. by failing to keep scheduled telephone contact and she has not made arrangements to participate in face-to-face visits with C.W., instead using the money she had "towards [her] fines and [her] probation fees in order to stay out of jail."  A trial court is permitted to consider a parent's drug use, inability to provide a stable home, and failure to comply with a family plan of service in its best interest determination.  *In re S.B.,* 207 S.W.3d 877, 877-78 (Tex. App.—Fort Worth 2006, no pet.).  B.D.'s ongoing use of methamphetamine and her willingness to remain in a relationship with D.B., who also uses methamphetamine, suggests that similar conduct will occur in the future, thereby constituting evidence of emotional and physical danger to C.W. now and in the future.  *In re V.A.,* No. 07-17-00413-CV, 2018 Tex. App. LEXIS 1521, at *13 (Tex. App.—Amarillo Feb. 27, 2018, no pet.) (mem. op.).  The evidence before the trial court concerning B.D.'s drug use was significant and thus, weighs heavily in favor of the trial court's best interest finding.

Other evidence supports the trial court's finding that termination of B.D.'s parental rights was in C.W.'s best interest.  At the time of trial, C.W. was fifteen years old, and he had remained with the same placement since November of 2019.  C.W. expressed to the caseworker that he was happy in his current placement.  According to the caseworker, C.W. is settled into a structured environment.  He is doing well in school, learning to control his emotions, and getting exceptional help with his ADHD.  C.W.'s placement

demonstrated an ability to meet C.W.'s needs and provide him with structure and a stable home environment. The Department's plan for C.W. is long-term placement.

Stability and permanence are paramount in the upbringing of children. *In re J.D.,* 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The factfinder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *Id.* at 119-20. At the final hearing, B.D. requested that C.W. stay in his current placement "for now," and that she be appointed possessory conservator. She suggested a friend was willing to take C.W., but her friend is a stranger to C.W. In contrast, the Department's plan for C.W. was a long-term placement with his current placement. C.W. is happy and thriving in the consistency and structure provided by his placement. The Department's plan would provide permanence and stability for C.W. and weighs heavily in favor of the trial court's conclusion that termination of B.D.'s parental rights was in C.W.'s best interest.

We conclude the evidence is legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of B.D.'s parental rights is in the best interest of C.W. Issue three is overruled.

Conclusion

The judgment of the trial court terminating B.D.'s parental rights is affirmed.


Judy C. Parker
Justice

17